Judge Tiffany M. Cartwright

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff <br><br> v. <br><br> MATTHEW RANDALL PING (aka RANDALL MATTHEW PING) <br><br> Defendant. | NO. CR25-5137TMC <br><br> UNITED STATES SENTENCING MEMORANDUM |

## I.   INTRODUCTION

In May 2019, Defendant Matthew Randall Ping received approximately $4,900 in direct deposit salary payments from his employer, the Washington State Office of Administrative Hearings (OAH).  *See* Ex. 1 (selected bank statements) at 1024, 1026.  In that same month, Ping's bank records show that he withdrew at least $3,800 at various Western Washington casinos to fund his gambling habits, and, by month's end, his checking account had been overdrawn down to a balance of -$27.03.  *See id.* at 1023-1027.

Starting in June 2019, Ping funded his lifestyle by stealing from Washington taxpayers.  In June 2019, Ping purchased five $500 visa gift cards for his personal use using OAH's credit card.  Ex. 2; *see also* Dkt. No. 8, Plea Agmt. ¶ 9h.  That was merely

United States' Sentencing Memorandum - 1
*United States v. Ping*, CR25-5137

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

the beginning. After this first successful theft and the cashflow that came with it, Ping's gambling exploded. In July 2019, Ping's bank records show that he withdrew more than $20,750 from his account at four different Washington casinos in that month, alone. Ex. 1 at 1003-1007. By the end of July 2019, Ping had drawn his account all the way back down to $63.28, *id.* at 1007, so he stole from Washingtonians again. On July 29, 2019, Ping used OAH's credit card to issue a $3,000 payment to a company named RCC Professional. Ex. 3. RCC Professional was a fictitious vendor that Ping had created through the payment processing company Square. *See* Plea Agmt. ¶ 9c. That credit card payment went directly to Ping and his bank account, and it was the first of many fraudulent payment processor credit card payments Ping made to himself. *Id.* ¶¶ 9c-g, l; Ex. 1 at 1007 (showing $2,886.70 deposit from Square to Ping's account).

Ping's theft skyrocketed after his gift card purchases and this first Square payment went undetected. Between 2019 and 2023, Ping stole a staggering $860,756 from OAH following this same credit card payment scheme, while also making more than $17,000 worth of personal purchases on OAH's credit card during this timeframe. Plea Agmt. ¶ 9l. He created four fictitious entities using two different payment processing companies, processed thousands of dollars of payments through those vendor accounts, and took considerable measures to hide his fraud from others at OAH. *Id.* ¶¶ 9c-l. He used this stolen taxpayer money to fuel his gambling habit, fund at least six trips to Las Vegas, pay off a luxury vehicle loan, and otherwise support his lifestyle. And, perhaps not surprisingly, he failed to report any of the income from his theft on his federal tax returns, which resulted in a tax loss of nearly $250,000. *Id.* ¶¶ 9o-q.

On June 9, 2025, Ping pleaded guilty to one count of wire fraud in violation of 18 U.S.C. § 1343 and one count of filing a false tax return in violation of 26 U.S.C. § 7206(1). For his role in these offenses, the government respectfully recommends the Court impose a total custodial sentence of 33 months, to be followed by a three year term of supervised release. Pursuant to the terms of the parties' plea agreement, the Court

United States' Sentencing Memorandum - 2
*United States v. Ping*, CR25-5137

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

should also order restitution in the amount of $1,118,362. Finally, the Court should impose a mandatory special assessment of $200.

## II. BACKGROUND

### A. Factual Background

The Washington State Office of Administrative Hearings is a state agency that hears and resolves disputes between state or local government agencies and Washingtonians.[1] Ping had been employed by OAH in some capacity since at least 2009, but in 2017, he was promoted to a Management Analyst position. Plea Agmt. ¶ 9a. As a Management Analyst, Ping was designated as credit card custodian for OAH, which meant he was responsible for reviewing and monitoring OAH's credit card activity. *Id.* ¶¶ 9.b, k. Ping repeatedly abused this role and his credit card access to fuel the scheme underlying his convictions. *Id.* ¶¶ 9b, i-k.

In July 2019, Ping created the Square account that he used to charge more than $330,000 to OAH's credit cards. *Id.* ¶ 9c.-d. Ping created and used three different display names for the account that were designed to give the appearance that the account was associated with legitimate vendors: RCC Professional, Soundage, and FourCorners.[2] *See id.* As a result of this sleight of hand, payments to Ping's fictitious vendor would show up on OAH's credit card statements as seemingly legitimate transactions:

| TRAN DATE | POST DATE | MCC CODE | TRANSACTION DESCRIPTION | REFERENCE # | AMOUNT |
|---|---|---|---|---|---|
| 12-18 | 12-21 | 8999 | SQ *SOUNDAGE* GOSQ.COM WA | 24692160354100604644505 | 7,000.00 |

| TRAN DATE | POST DATE | MCC CODE | TRANSACTION DESCRIPTION | REFERENCE # | AMOUNT |
|---|---|---|---|---|---|
| 12-31 | 01-04 | 8999 | SQ *FOURCORNERS* GOSQ.COM WA | 24692160366100453940216 | 5,250.00 |
| 12-31 | 01-04 | 8999 | SQ *FOURCORNERS* GOSQ.COM WA | 24692160366100501104617 | 1,535.23 |

| TRAN DATE | POST DATE | MCC CODE | TRANSACTION DESCRIPTION | REFERENCE # | AMOUNT |
|---|---|---|---|---|---|
| 10-28 | 10-29 | 8999 | SQ *RCC PROFESSIONAL TUMWATER WA | 24692169301100940241987 | 2,000.00 |

---

[1] *See* https://oah.wa.gov/about-oah/about-office-administrative-hearings
[2] Indeed, the name "FourCorners" appears to have been specifically selected to emulate a legitimate vendor that OAH had paid for services named FourCorners Translation LLC. https://fourcornerstranslation.com/

United States' Sentencing Memorandum - 3
United States v. Ping, CR25-5137

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

In 2021, Ping switched to the payment processing company Intuit for his fraudulent credit card payments, but he used the same pattern to complete the fraud. Plea Agmt. ¶ 9e-f. Ping created an Intuit account using the display name SRBC Consulting—again for purposes of giving the impression that the Intuit Account was associated with a legitimate vendor when it was not. *Id.* Accordingly, as was the case with Ping's Square payments, transactions with the Intuit account appeared on OAH's credit card as legitimate payments to SRBC and included a contact phone number that was not Ping's number:

| TRAN DATE | POST DATE | MCC CODE | TRANSACTION DESCRIPTION | REFERENCE # | AMOUNT |
|---|---|---|---|---|---|
| 10-20 | 10-21 | 8999 | IN *SRBC CONSULTING 360-3588286 WA | 24692162293109232639225 | 3,000.00 |
| 10-20 | 10-21 | 8999 | IN *SRBC CONSULTING 360-3588286 WA | 24692162293109232639233 | 5,200.00 |

Between 2021 and 2023, Ping completed more than $530,000 in fraudulent credit card payments through the Intuit account. *Id.* ¶ 9f.

Ping took additional steps to conceal this fraud beyond just the use of a revolving list of fictitious entities. Specifically, he made calculated efforts to circumvent OAH vendor policies and manipulate OAH's accounting data to hide his tracks. OAH policy required all direct pay vendors to be registered and approved via a statewide vendor system, and payments could not be authorized to vendors unless they had been registered. *See* Ex. 6 at 2921-2922. Ping did not register any of his fictitious vendors as required. *Id.* Instead, he circumvented the registration process that is designed to capture this kind of vendor fraud by exploiting a loophole in the vendor system that allowed the vendor to be coded as US Bank—OAH's credit card provider who was already an approved vendor—for credit card payments. *Id.* This helped Ping hide his four fictitious entities from further OAH scrutiny.

OAH policy also required credit card payments to be reviewed, paid, and documented using a batch payment system designed to prevent fraud. *See id.* at 2919-2922 (detailing OAH accounting policies); Plea Agmt. ¶¶ 9i-j (same). Under this system,

United States' Sentencing Memorandum - 4
United States v. Ping, CR25-5137

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

monthly credit card transactions were supposed to be batched together for payment, and multiple employees had to review and approve the batch before payment could be released. *See* Ex. 6 at 2919-2922; Plea Agmt. ¶ 9i. Ping was the only employee at OAH who had access to OAH's credit card statements, and he would use that access to prepare incomplete transaction batches that only contained legitimate OAH transactions for review by his coworkers. *See* Ex. 6 at 2920-2921; Plea Agmt. ¶ 9i. Once those legitimate transactions were approved and paid via a legitimate batch payment, Ping would circumvent the required approval process by approving and releasing payments for his fraudulent transactions by himself without the required oversight. *See* Ex. 6 at 2920-2921; Plea Agmt. ¶ 9i. Although OAH required every payment to have its own batch number, Ping hid his fraudulent payments by logging and releasing them under the same batch number that had been created for the legitimate transactions. *See* Ex. 6 at 2920-2921; Plea Agmt. ¶ 9j. As a result of this batch number duplication, the OAH employee responsible for reviewing payment batches was unable to notice that there were batch payments made by Ping that the employee had not reviewed. *See* Ex. 6 at 2920-2921; Plea Agmt. ¶ 9j. Finally, Ping was also responsible for reconciling OAH's credit card activity and collecting supporting documentation for credit card transactions—tasks he did not perform while he was stealing from OAH. *See* Ex. 6 at 2920-2921; Plea Agmt. ¶ 9k.

On May 23, 2023, the Washington State Auditor's Office launched a regular accountability audit for OAH and emailed Ping and other OAH employees a list of credit card transactions to test as part of the audit. *See* Ex. 5 at 2948. Two of the testing samples were SRBC credit card payments. *Id.* The following day, Ping began taking leave from work based on reported medical issues for Ping and his family members. *Id.* OAH employees began to ask Ping questions about some of the test transactions for the accountability audit, but Ping avoided answering those questions and continued to take leave from work. *Id.* On July 2, 2023, Ping resigned from OAH. *Id.* After his

United States' Sentencing Memorandum - 5
*United States v. Ping*, CR25-5137

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

resignation, OAH and the State Auditor's Office made multiple attempts to contact Ping to interview him about these transactions, but he did not respond to those requests. *See* Ex. 6 at 2920.

In total, Ping made at least 210 credit card transactions via Square and Intuit that charged at least $860,756 to OAH's accounts. Plea Agmt. ¶ 9l. Ping also charged at least $17,359 on OAH's credit cards for unauthorized personal purchases, which brings OAH's total loss to $878,115 as a result of Ping's fraud. *Id.* Review of Ping's bank records appears to show that Ping primarily used the money to pay for his gambling losses, but those records also show that Ping took out a $56,000 loan for a 2019 Mercedes-Benz in 2022, *see* Ex. 4, and that he took at least six trips to Las Vegas between 2019 and 2023. *See* PSR ¶ 20 n.1. Ping also failed to report any of the fraudulent payments he made to himself as taxable income for tax years 2020-2023, which resulted in a tax loss of $240,247 to the United States Treasury. Plea Agmt. ¶¶ 9o-q.

**B.    Procedural Background**

On June 5, 2025, the government charged Ping with one count of wire fraud and one count of filing a false tax return via a felony information. Dkt. No. 3. Ping pleaded guilty to both counts on June 9, 2025. Dkt. Nos. 8-9. Pursuant to his plea agreement, the government agreed to cap its sentencing recommendation at 33 months. Plea Agmt. ¶ 14. Ping agreed to make restitution in the amount of $878,115 to OAH and $240,247 to the United States Treasury. *Id.* ¶ 15.

### III.    SENTENCING GUIDELINES CALCULATIONS

**A.    Government's Guidelines Calculation**

Ping's sentencing guidelines range is 37-46 months. Ping's only criminal history is a 1997 conviction that does not yield any criminal history points. PSR ¶¶ 51-53. Accordingly, he is a criminal history category (CHC) I. Ping's total offense level in this case is 21, calculated as follows:

United States' Sentencing Memorandum - 6
United States v. Ping, CR25-5137

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Wire Fraud Calculation

| Item | Guideline | Offense Level/Adjustment |
|---|---|---|
| Base offense level | 2B1.1(a)(1) | 7 |
| Intended loss in excess of $550,000 | 2B1.1(b)(1)(H) | 14 |
| Sophisticated Means | 2B1.1(b)(10)(C) | 2 |
| Abuse of Trust | 3B1.3 | 2 |
| **Total Offense Level** | | **25** |

False Tax Return Calculation

| Item | Guideline | Offense Level/Adjustment |
|---|---|---|
| Base offense level tax loss in excess of 100K | 2T1.1. 2T4.1(F) | 16 |
| Failure to report criminal proceeds | 2T1.1(b)(1) | 2 |
| **Total Offense Level** | | **18** |

These offenses do not group under USSG § 3D1.2, which means that the higher offense level for the wire fraud charge applies. USSG § 3D1.4(a). Because the tax group offense level is seven levels less serious than the wire fraud offense level, the total offense level increases by one level to 26. USSG § 3D1.4(b). However, Ping receives a five level decrease on his offense level because he qualifies as a zero point offender and he timely accepted responsibility, which brings his final offense level calculation to 21:

| Item | Guideline | Offense Level/Adjustment |
|---|---|---|
| Wire fraud offense level | 3D1.4(a) | 25 |
| Increase for tax offense level | 3D1.4(b) | 1 |
| Acceptance of responsibility | 3E1.1 | -3 |
| Zero point offender | 4C1.1 | -2 |
| **Total Offense Level** | | **21** |

As a CHC I with a total offense level of 21, Ping's sentencing guidelines range is 37-46 months.

**B.      Application of Sophisticated Means Enhancement**

In reaching its conclusion that Ping's offense level is 21, the government has only one disagreement with Probation's calculation of Ping's offense level in the PSR: Ping's

United States' Sentencing Memorandum - 7
United States v. Ping, CR25-5137

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

conduct qualifies for a two level increase because he utilized sophisticated means in committing this offense. USSG § 2B1.1(b)(10)(C). The application notes to section 2B1.1(b)(10) state that this enhancement applies when the defendant engaged in "especially complex or especially intricate offense conduct pertaining to the execution or concealment of the offense." *See* USSG § 2B1.1, Note 9(B). That same note lists the *exact* conduct that Ping engaged in as an example of the type of conduct that "ordinarily indicates sophisticated means"—"hiding assets or transactions, or both, through the use of fictitious entities [or] corporate shells." *Id.* Ping created four fictitious entities using entity names designed to conceal his fraud by making them look like legitimate vendors, he paid those entities as if they were legitimate OAH vendors when they were not, and then he funneled the money from the payment processor accounts to his own bank accounts. As a result of this misdirection, anyone who looked at OAH's credit card statements would have seen payments that appeared to be made to accounts associated with real vendors, not Ping. *See, e.g.*, Ex. 3.

Courts routinely recognize that this kind of conduct reflects sophisticated means. For example, in *United States v. Jennings*, the Ninth Circuit affirmed application of a sophisticated means enhancement where the defendants "syphoned money" from a legitimate business to themselves using a bank account that that was intentionally named in a way that "mimicked the name of the company's primary vendor," which meant that payments to the fictitious account appeared to be made "for legitimate business purposes" even though there was no legitimate purpose for the account beyond defendants' personal use. 711 F.3d 1144, 1147 (9th Cir. 2013). Notably, the defendants in *Jennings* opened the account in their real name using their personal identifiers—as Probation and defense counsel note Ping did in this case, *see* PSR ¶ 30 & Objection Responses[3]—but that did

---

[3] The government also notes that Probation's objection response misconstrues the facts. As the plea agreement and records and screenshots provided in this memorandum show, Ping used *four* fictitious vendors to conduct his transactions, and he did create vendor profiles for these vendors on Square and Intuit. *See* Plea Agmt. ¶¶ 9c., e; *see*

United States' Sentencing Memorandum - 8
United States v. Ping, CR25-5137

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

not change the calculus. *See id.* *Jennings* is just one case of many that applies sophisticated means in this context. *See, e.g.*, *United States v. Niko*, 584 F. App'x 693, 694 (9th Cir. 2014) ("Niko opened a bank account associated with his own name and social security number, but in the name of a fictitious entity, in an effort to conceal fraudulently obtained income."); *United States v. Sutton*, No. 23-2022, 2024 WL 3549085, at *2, *6 (10th Cir. July 26, 2024) (affirming application of sophisticated means enhancement for defendant who "created his own accounts with various payment processors such as PayPal, Stripe, Square" as part of his fraud); *United States v. Davis*, No. 19-CR-199-RJA, 2025 WL 271645, at *1 (W.D.N.Y. Jan. 23, 2025) ("Defendant used sophisticated means to carry out her schemes. To avoid transferring currency directly to her name, Defendant used PayPal as a conduit to transfer currency out of victims' accounts into accounts under fictitious business names she controlled.").

   Although Ping's use of fictitious vendors to cover up his fraud is sufficient to apply the enhancement, Ping engaged in additional complex or intricate conduct in concealing this offense that bolsters the case for applying the enhancement. Specifically, Ping (1) hid his fraudulent vendors from OAH scrutiny by processing the payments through OAH's US Bank credit card, which allowed him to circumvent OAH's vendor registration requirements; (2) doctored OAH's credit card statements by excising his fraudulent transactions from the transaction backup data that was provided to his co-workers for batch payment review and approval, which hid those transactions from scrutiny; (3) manipulated OAH's accounting data by logging his fraudulent payments using duplicate batch payment numbers, which also made it harder for Ping's co-workers to identify the additional payments that Ping had reviewed and approved himself; and (4) intentionally failed to conduct any kind of internal review or audit of OAH's credit cards even though those were tasks he was responsible for at OAH. *See* Plea Agmt. ¶¶ 9i-k;

*also supra* at 3-4 (detailing Ping's use of fictitious vendor accounts and providing screenshots of OAH bank statements); Ex. 3 (bank statement excerpt showing payment to "RCC Professional").

United States' Sentencing Memorandum - 9
*United States v. Ping*, CR25-5137

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Ex. 6. Thus, even if the Court concludes that some of Ping's actions were not particularly sophisticated, this conduct—taken together with his use of fictitious vendors—shows that the "totality of the scheme" qualifies for the sophisticated means enhancement. *See United States v. Augare*, 800 F.3d 1173, 1175 (9th Cir. 2015) (quoting *United States v. Ghertler*, 605 F.3d 1256, 1267–68 (11th Cir. 2010)); *see also Jennings*, 711 F.3d at 1145 ("Conduct need not involve highly complex schemes or exhibit exceptional brilliance to justify a sophisticated means enhancement.").

Based on this caselaw and the language of the guidelines, the government asserts that the sophisticated means enhancement should apply to Ping's offense in this case. If the Court agrees with the government, Ping's guidelines are 37-46 months. Alternatively, if the Court disagrees, Ping's guidelines are 30-36 months.[4]

## IV.   FACTORS RELATED TO SENTENCING RECOMMENDATION

Ping's substantial theft from the state of Washington and failure to pay taxes on the proceeds of that theft is severe conduct that warrants a substantial sentence. Accordingly, the United States respectfully requests that the Court sentence the defendant to 33 months of confinement, followed by a three-year term of supervised release. The United States believes this sentence is appropriate in light of "the nature and circumstances of the offense," and the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," and "to protect the public from further crimes of the defendant." 18 U.S.C. §§ 3553(a)(1), (a)(2)(A), and (a)(2)(C). A review of pertinent Section 3553(a) sentencing factors, below, supports the recommended sentence.

---

[4] The Court's resolution of this dispute will not alter the government's sentencing recommendation in this case. For the reasons set forth below, the government believes that a 33 month sentence is appropriate as either a within-guidelines recommendation (if Ping's offense level is 19) or a below-guidelines recommendation (if Ping's offense level is 21).

United States' Sentencing Memorandum - 10
United States v. Ping, CR25-5137

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

A.  **Nature and Circumstances, and Seriousness of the Offense**

Ping's theft is gravely serious. Over a period of just four years, Ping stole nearly $900,000 from OAH through credit card fraud at a time when OAH had entrusted Ping to serve as the custodian of its credit cards. Embezzlement of any kind on this scale is extremely concerning, but it is particularly harmful when it impacts public entities like OAH that rely on public funds to function. Indeed, the public impact of Ping's theft and the resulting tax loss is difficult to overstate. Ping's theft was reportedly the largest internal misappropriation at a Washington state agency in more than 15 years.[5] This kind of theft significantly undermines public confidence in state agencies, which is uniquely frustrating in this case given that OAH had fraud-prevention policies in place and specifically entrusted Ping to enforce those policies and monitor the very credit card payment processes that he abused to enrich his own bank accounts.

Although Ping's federal tax fraud is less severe than his embezzlement from OAH, his federal tax fraud exacerbated the public harm caused by his theft from OAH. By embezzling from a Washington administrative agency as a state employee and failing to pay federal taxes on the proceeds of his theft, Ping effectively victimized all Washingtonians three separate times. The funds Ping stole were Washington taxpayer monies meant for OAH's lawful use as an administrative agency; Washington taxpayer money funded his salary, meaning that Washingtonians paid Ping to steal from them for four years; and by failing to pay income taxes on his stolen proceeds, Ping deprived Washingtonians of federal taxpayer funds that are meant to be used for the benefit all United States citizens. Thus, this is not the kind of case where tax charges should be treated as duplicative or a throwaway.

In sum, given the severity of this theft, the breach of the public trust, and the taxpayer losses, a 33 month sentence is warranted.

---

[5] https://www.seattletimes.com/seattle-news/politics/wa-auditor-worried-by-growing-boldness-with-900k-misappropriation/

United States' Sentencing Memorandum - 11
United States v. Ping, CR25-5137

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

B.   **History and Characteristics of the Defendant**

Although the government recognizes that Ping has faced challenges throughout his life, the balance of aggravating and mitigating factors in Ping's history and characteristics does not meaningfully impact the government's recommendation for a number of reasons.

First, the PSR reports that although Ping's childhood was not perfect, he has supportive family members in his life, and he was presented with educational and professional opportunities—including his 15 year employment at OAH—that others who turn toward crime often do not receive. *See* PSR ¶¶ 58-65, 84-86, 90-93, 95-97. Despite these opportunities, Ping chose to enrich himself through a years' long scheme to steal from his employer and the citizens of Washington state, which is an aggravating factor.

Given the sheer volume of gambling losses that Ping reported during the time of his theft, the government acknowledges that a gambling addiction likely contributed to Ping's offense conduct in this case in some manner. But that addiction should not excuse Ping's conduct. Notably, a review of Ping's bank records reflects that Ping's realization that he could steal taxpayer monies may have caused—or at least significantly exacerbated—any gambling addiction Ping currently suffers from. In May 2019, before Ping had engaged in any known theft from OAH, Ping's regular salary payments at OAH outpaced the number of casino withdrawals reflected on his account. *See* Ex. 1 at 1023-1027. By July 2019—once Ping had gained access to taxpayer funds through credit card fraud—Ping's casino withdrawals were more than four times his monthly income from OAH, *id.* at 1003-1007, suggesting that his turn towards criminal behavior poured gasoline on his addiction, and not the other way around.

Regardless of the causal root of Ping's addiction, the PSR reflects that Ping had the means and self-recognition to attempt to address his gambling problems and the impact they were having on his life. *See* PSR ¶¶ 67-69, 75-79. At any point during the four years that Ping stole from OAH, he could have at least taken steps to try to address

United States' Sentencing Memorandum - 12
*United States v. Ping*, CR25-5137

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

his addiction. Instead, outside of one reported phone call to a hotline and non-specific reports of attending Gamblers Anonymous meetings, *see id.* at ¶¶ 76, 78, Ping made no meaningful efforts to address his issues and instead decided to continue stealing from OAH to fund his gambling, his trips to Las Vegas, and his purchase of a 2019 Mercedes-Benz. The government acknowledges that addiction can be a significant contributor to criminal conduct and, in some cases, the impact of addiction can warrant sentencing leniency. But the record in this case shows that Ping was well-aware of his gambling issues and had resources available to help him—by way of family, friends, and stable employment in addition to other publicly available gambling addiction resources. Yet, Ping made no serious efforts to try to get help or stop his theft until his fraud was unraveled by OAH.

Finally, the government also acknowledges that outside of one state conviction from 1997, Ping has no criminal history. However, the plea agreement, the guidelines, and the government's 33 month recommendation—which is below the guidelines range if the Court adopts the government's reading of the guidelines—already account for that limited criminal history. Further downward variance from the guidelines is unwarranted.

C. **Other Sentencing Factors—Deterrence and Protecting the Public**

The need to promote respect for the law and afford both general and specific deterrence should weigh heavily on the Court's sentence in this case. Public employees—especially those who are stewards of public funds like Ping was—hold important positions of trust in our society. Ping abused that trust, and that kind of behavior cannot be tolerated or allowed to become commonplace. It is the government's hope that a significant sentence will instill respect for the need to safeguard public monies and send a message that deters other public employees in Ping's position from embezzling from taxpayers.

Specific deterrence and the need to protect the public from future crime is also highly relevant in this case. As Ping acknowledges, he suffers from a gambling

United States' Sentencing Memorandum - 13
*United States v. Ping*, CR25-5137

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

addiction. Although the government is encouraged by the steps he is now taking to address that addiction, his addiction creates risk that he will re-offend upon his release. The government believes that a significant sentence—plus a lengthy period of supervision—will provide the consequences Ping needs to avoid returning to theft upon his release, while also giving him additional treatment resources and oversight upon his release to help fight that addiction. A sentence of 33 months, plus three years of supervision, will hopefully be sufficient, but no greater than necessary, to accomplish those goals.

**D.    Need to Avoid Unwarranted Sentence Disparity**

The government's recommended sentence would not yield sentencing disparities. Section 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Congress's "primary goal" with section 3553(a)(6) was promoting nationwide consistency in sentencing, *United States v. Jaycox*, 962 F.3d 1066, 1071 (9th Cir. 2020)—that is, to avoid "unjustified difference" across judges or districts, *United States v. Saeteurn*, 504 F.3d 1175, 1181 (9th Cir. 2007). The guidelines, which are themselves an anti-disparity formula, are the best tool for achieving that goal. *See Gall v. United States*, 552 U.S. 38, 49, 54 (2007); *Rita v. United States*, 551 U.S. 338, 354 (2007); *United States v. Osinger*, 753 F.3d 939, 949 (9th Cir. 2014). Here, the government's 33 month sentencing recommendation is either within or slightly below the guidelines range (depending on the Court's resolution of the guidelines dispute), which will help avoid meaningful sentencing disparities.

Although the process of identifying comparator cases is difficult given the unique mitigating and aggravating facts of these kinds of cases, the government has identified a handful of recent comparators from this district. From a factual viewpoint, the sentence issued in *United States v. Guillory* is a suitable comparator. *See United States v. Guillory*, CR23-0077RSM. Like Ping, the *Guillory* defendant held an accounting role at

United States' Sentencing Memorandum - 14
*United States v. Ping*, CR25-5137

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

her place of employment and used that role to steal from her employer using fraudulent vendor payments and payment processing companies. *See id.*, Dkt. No. 8, ¶ 9. Guillory also failed to pay taxes on her theft. *Id.* Guillory caused substantially higher losses than Ping did (approximately $2.5 million in fraud losses and $600,000 in tax losses)—which resulted in higher guidelines. *See id.* But her personal characteristics carried more mitigating weight than Ping's, and her conduct did not have the same public impact that Ping's conduct caused. *See id.*; *see also* Dkt. No. 21, Gov. Sentencing Memo at 5-6 (noting that Guillory had an ACEs score of 10 and that her traumatic childhood gave rise to a drug addiction that fueled her theft). Guillory was ultimately sentenced to 36 months in custody. Dkt. No. 28. Taking all these factors into account, a sentence slightly below what Guillory received appears appropriate.

The government is also aware of other comparable embezzlement sentences that support the 33 month recommendation in this case. First, the government is aware of two cases in this district where defendants received longer sentences for embezzling more money than Ping did or engaging in other aggravating conduct on top of embezzlement. *See United States v. Smith*, CR19-00107RSL (51-month sentence where project manager embezzled approximately $1.5 million from ship construction company in connection with Coast Guard contract; defendant obstructed justice by lying to FBI agents); *United States v. Andersson*, CR16-128JLR (46-month sentence where accounting manager embezzled about $2.3 million from a freight management company). As another example, a defendant who embezzled approximately $1 million from Microsoft—a comparable amount to Ping's theft—received only 28-months, but a significant mitigating factor in that case was that the employee returned all of the money he embezzled before being charged. *United States v. Tran*, CR18-249RSM. The government submits that each of these cases shows that a 33 month sentence for Ping is warranted.

United States' Sentencing Memorandum - 15
*United States v. Ping*, CR25-5137

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## V. RESTITUTION

Pursuant to the parties' plea agreement, the Court should order restitution in the amount of $1,118,362. Plea Agmt. ¶ 15. Specifically, the plea agreement reflects Ping's agreement to make restitution of $878,115 to the Washington State Office of Administrative Hearings and $240,247 to the United States Treasury. *Id.* Since entering the plea, undersigned counsel for the government has confirmed that National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") provided insurance coverage to OAH that covered $628,115 of OAH's $878,115 in losses. Accordingly, pursuant to 18 U.S.C. § 3664(j)(1), National Union is entitled to receive restitution on OAH's behalf.

## VI. CONCLUSION

For the reasons set forth above, the government respectfully recommends the Court sentence Ping to a total custodial sentence of 33 months, to be followed by a three year term of supervised release. The Court should also order restitution in the amount of $1,118,362. Finally, the Court should also impose a mandatory special assessment of $200.

DATED this 4th day of September, 2025.

Respectfully submitted,

Teal Luthy Miller
Acting United States Attorney

 s/ Dane A. Westermeyer
DANE A. WESTERMEYER
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Phone: 206-553-2266
Email: dane.westermeyer@usdoj.gov

United States' Sentencing Memorandum - 16
*United States v. Ping*, CR25-5137

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970